The United States Department of Health and Welfare Office is now open for discussion. The United States Department of Health and Welfare Office is now open for discussion. The case, of course, refers to the medical safety needle, and the sole issue here is one of literal infringement of Becton Dickinson's Improvement Act, which we claim claims the addition of a separate spring to a conventional medical needle. The District Court recognized that the accused products do not have separate springs, but it then erred in construing the claim to say it doesn't require a separate spring. Under the correct claim construction, we believe that this Court should reverse the denial of JMOC, of non-infringement. In addition, we have also, and I will discuss, the absence of any substantial evidence, even under the Court's construction, and under the Court's limitation of the plaintiff to the single theory put forward in discovery through its expert, that there is no substantial evidence of infringement according to its sole theory that properly indicates. With respect to claim construction, we know that the limitation was basically paraphrased by the District Court in its construction. But, in denying summary judgment in 2004, the District Court made clear that it viewed its construction as not requiring a separate spring, and it also acknowledged that that was our contention, the title's contention, that it was separate. With respect to the means plus function issue, the spring, I guess your contention is what? That spring is or is not a recognized term of structure? We say it is not pursuant to the unidynamics case, which so far we think our case is quite likely. So we say it is not sufficient structure. But unidynamics is a little different, is it not? Because in unidynamics, in the specification, you had some language that indicated that spring means was something other than a spring. The specification said something like, well, spring means is an example of a spring. Yes, although it wasn't that explicit, Your Honor. I think what was in common in that case and ours is the breadth with which the patentee in both cases here and there wanted spring defined very expansively. In fact, the plaintiffs in their closing argument said a spring can be a diving board, a cap for a plastic bottle. And then their expert said a spring is basically springiness. So if it was all presented functionally and the claim and the specification even refers to it generally as biasing, then claims it as spring means. But may I say one thing, Your Honor, before we get too deep into means plus function, it's our position that whether or not this Court concludes that spring means is subject to 1126, that the proper construction is that it is a separate element from the other three elements, and particularly from the hinged arm, and that therefore a proper construction, whether or not you say it's subject to 1126, is that it's separate. And the district court in this case already found that there are no separate springs in the accused class. But Mr. Courtside, would one of the hinges be sufficient to cover the spring? What if there were not three of the hinges, just one? Yeah, I mean, the preferred body one only shows, it shows an added spring to the three, to the two hinges. So we have one closed spring. It showed a closed spring. It also showed a living hinge added, already made capable of acting as a spring, added to the hinged arm. That's 68. So I agree, one would be enough. But the point is that, first of all, it's got to be separate. And the district court, as we recognize that the three hinges of the accused product are part of the hinged arm, because that's the way the claim reads. The claim requires three articulations. We know that articulation obviously means rotating or pivoting around something. So that's already in the hinged arm. And they cannot, if you agree with our construction, separate that's what the spring means. They cannot point to one of the hinges and say, well, that's the spring means. In fact, that's why we think there's one reason why they don't get into trial, if you agree that the claim of construction is wrong. Because they had every opportunity to make all these other theories, including to argue that the spring was indeed separate. The district court found that it was not separate. What about claim 11, where claim 11 is dependent from claim 1 and says, the spring means comprises an over-centered hinge. Now, doesn't that suggest that the spring means is or can be part of the hinge assembly? Or I should say, the hinge that connects the spring to the hinged arm. No, Your Honor, because what that's referring to in the specification is spring element 68. You can point to that as an added spring element. You have the real hinged part 66. So all we're saying is you've got to be able to point to something that's not the hinged arm or its hinges and say that's the spring. In this case, 68 in the purported embodiment. In our case, there are no such things that you can point to. All you can point to is the basic conventional hinged arm. So I don't think that dependent claim is inconsistent at all. It just tells you to look at the purported embodiment for the meaning of that. I would point out that the district court actually found, in connection with summary judgment in 04, we were arguing that there was a requirement for a separate spring and that our products did not have a separate spring. The district court disagreed with our claim construction, but at age 68 in its ruling, it found that opiate-infused products do not have a separate spring. Now, if the defendant, the plaintiff, was not happy with that, at that point they should have challenged that and said, Your Honor, there are separate springs in these products. They were content to let the court make a finding, which you can do, assuming it was not in dispute because of the summary judgment, and then say the only real dispute is if I say there's no requirement for a separate spring. So I think the boat has sailed on these arguments. I would say that it's not just the fact that the claim language itself calls for a separate spring. It's four elements, and the fourth element, the spring, is connected to the hinged arm. You can't be connected to yourself under rational reading. In what case cited by the plaintiff so holds? I would think the Gauss case is at least more important than the two cited by the defendant. By the plaintiff, which in fact are different because in the applied materials case, the court then goes on and says, Well, if you look at the prosecution history and the specification, it's possible that you do have to have separate elements if they're so caught. I looked through the specification with respect to the word spring, and this is getting back to the means of prosecution issue. I look back to see whether the word spring is used throughout that specification in a functional way or as a term of structure, and it seemed to me that throughout, it was consistently used as a term referring to structure, albeit there are two different kinds of structures, but both of those structures are referred to as springs. One is a coil spring or a spring, and the other is a spring element. They're both referred to in structural terms. What is it that might lead us to conclude that in the claim, the word spring does not have that structural connotation and is used as a word of function? Well, I think that the expert testimony by the plaintiff actually wanted a much more expansive meaning of that word and secondly, they put the word means in. This court has been going on this means issue for 20 years. Maybe it's about time to not lower the boom on these claim directors who keep putting means in there hoping that exactly what will happen is happening here, a fight about whether it's within or without 1126. This court has said there's a presumption that means is subject to 1126. Well, maybe it's time for the court to make that a real strong presumption and not something that can be subject to litigation. But if the spring means that you're trying to define as a functional aspect, would you say the spring is a function? I'd say the spring is insufficient structure to avoid 1126, but again, Your Honor, can I just make this point again? It doesn't matter whether or not these claims are subject to 1126 because the evidence that they are a separate element from the hinged arm, according to the claim, according to the file of history and according to the specification, and Your Honor, according to the specification on the means plus function issue, that the very same things you're relying on there show the separateness. You can point to 68, you can point to 90, you can point to the hinged arm and everything covered by the hinged arm is except for 68 and 90. Those are separate. But is it fair to say that the spring is just the element 68? It doesn't function in its capacity without the other tab, 66 I think they are. Those 66 and 68 together function. It doesn't say that it's true. The name of the whole thing might suggest that, but if you read the spec, the only thing that's performing the spring function is 68 and the spec says that 66 is performing the hinged function of letting the proximal arm rotate around. So it's very clear that there's a distinction of separateness. And in fact, that's what the, in the re-exam, the examiner, although saying in Subject 1, Crop 6, what she was really saying, I think, was it's a separate element. And if you want to avoid the dutch patent, then I'm reading this essentially as it's got to be separate. So Tate Access is a case, you know, pointed out in footnote 4 that the dutch patent itself is evidence of intrinsic evidence because it was cited in the class history. And of course, the court said in Cortis, the Medtronic, that the re-exam is part of the intrinsic prosecution history. So you have all the evidence going one way and really no evidence going the other way. For this class, you have the fact that, well, what did the inventors invent here? And I think they invented a separate, the idea of adding a spring to the conventional hinged arm with a hinged arm and nil and barge. Your Honor, shall I do a rebuttal? Yes, Your Honor. I just want to say one quick thing on the sufficient evidence. If you look, even in the court's construction, at all the evidence that is being relied on by the plaintiff, it comes in two categories, both of which are outside the theory proposed originally by the plaintiff. And that is, it either is pre-latching evidence or it's evidence of combination of the spring means in combination with the other finger. Let me ask you one question before you sit down quickly. And that is, if we agree with you on the, or if we disagree with you on the means plus function aspect, but agree with you on the separate element aspect, does that mean the case should be reversed? Yes, Your Honor. Remand is not necessary? No remand is necessary. Exxon-Lubrizio is right on point. They knew since 2003 that we were advocating that this was a separate spring. For summary judgment, we said it was means plus function. Okay, I don't want to take that. There's no remand. Thank you. Mr. Lee? Yes, Your Honor. May I please record? My name is Bill Lee, together with my partner Amy Whitmore, who represents the plaintiff's affiliate, Death and Dignity Center of D.D. Let me address my time with three points. First, the means plus function limitation and the argument about its spring means. Second, the argument separate, and I would note that the first 47 pages of the brief of the appellants were devoted to the first issue and not to the second, but I'll come to the separate issue and then briefly address the question of the sufficiency of the evidence. On the means plus function limitation, I can make these four points responding principally to the reply break filed by the appellant. First, it is the central claim construction issue. It was the focus at trial. It was the focus of the GMO motion. It was the focus of the briefing here. Judge Lynn asked a question about what the patent discloses, and in fact, unlike in the dynamics, every disclosure of a spring in the 5447 is a structural spring, and there are three kinds. There is an over-the-center spring in Figures 2 to 4. There is a coil spring in Figures 6 to 8, and there also is a living hinge disclosure, and in fact, the embodiments have more than one spring. All of them are structural, which distinguishes the case from unidynamics, where the court was confronted with a specification that said that a structural spring is just one example of a spring meaning tending to keep a door closed. For that reason, we believe this case is much closer to internal care, where the court distinguished unidynamics, focused on a specification that disclosed only structural springs and found compressed spring means to be sufficiently structural under Allen and the court's other cases not to be a means-plus-function limitation. For internal care, there was a specific device for compressed spring means, or at least so the opinion held. I think that's correct, Your Honor, but I think if we disassembled Judge Bison's opinion, there was compressed spring means the structure was the spring. The compressed was a description of the state of a spring, and a spring can be compressed and released, and that's a description of its state. The question is what was the structure that the court was focusing upon, and the structure was the spring. Just as if you consider the portion of the specification here, the over-the-center spring refers to a type of spring. The coil spring refers to a type of spring, which could be compressed or decompressed, as the specification demonstrates. And, in fact, there are also living hinges, and for that reason we suggest this case is much closer to total care. Now, Mr. Corsari also refers in the reply brief that there was a substantial amount of attention to what happened at the Patent and Trademark Office on the exam. We suggest that Tycho's argument on the exam is incorrect, particularly the argument articulated in the reply for four reasons. First, as his court held in SRAM, the fact that the Patent Office has adopted a particular claim interpretation is not binding on this court, nor is it binding on the district court, but we're all obligated to undergo the discipline and consider the appropriate intrinsic and extrinsic evidence. Second, in this particular case, the examiner's analysis of this issue was just four lines. The examiner did not, as SRAM suggests, adopt the broadest possible interpretation, but in the four sentences simply said, it means plus function. The court has no guidance as to why she reached that decision, whether she considered the prelumption, whether she considered whether there was sufficient structure. So for that reason, we would suggest that there's insufficient guidance for it to be binding, as Tycho might suggest. MR. CORSARI Even if we agree with you that on the means plus function issue, there's still this separate question of whether the spring is a separate element. And I think I was a little confused with Mr. Corsari's argument, but let me at least state what I understand to be the state of the record and why that gets us. The district court did not make a finding as to whether there was a separate hinge or not in the accused devices. That wouldn't have been a finding for the district court to make. They made the argument that you had to have a separate hinge that was separate from the hinged arm. We argued that that wasn't correct, that a single structure could satisfy both. And we argued that if you look at figures two to four, there are artificial drawing lines as to what's the hinged arm and what's the hinge. The fact of the matter, Your Honor, is my elbow connects my upper arm to my lower arm, but it's still part of my arm. And both as a factual matter, you can have something connecting the upper arm to my elbow and still be part of the arm. And as a linguistic matter, the claims don't require it to be separate. This case is very much like the applied medical research case. It says, I suggest correctly, we suggest correctly, that when you have two limitations, a single structure, particularly a single structure that has multiple parts, can satisfy that limitation. In addition, Your Honor, if the court considers the figures at Appendix 14.838, what you'll see, there's a reason that this issue didn't appear until 47 or 48 pages. This was not the focus of this litigation until this morning. And what you'll see at A. 14.838, which is discussed in our red brief, is this. There are three hinges, living hinges, in the Tycho safety wheel. There is, to be sure, one that is the moral equivalent of my elbow, but there are two other living hinges that are manufactured by Tycho with stored energy, one connecting the guard to the body, and one at the distal end. There's a reason this hasn't been the focus. Even if they were right, that you needed a separate hinge, and that the hinge joining the two arms was insufficient, their device has it. It's their diagram that shows three different living hinges. It's their diagram that shows one of them in precisely the same location as Items 62, 66, and 68 from Figures 204. First, as I read Claiborne, it defines a hinged arm as something that has proximal and distal segments articulated to one another. So it seems to me that it's referring to, in your analogy, upper arm, the lower arm, and the elbow. That's all it says. A hinged arm having proximal and distal segments articulated to one another. And then later on, it talks about springings connected to said hinged arm. Well, Your Honor, I think everything you said is correct. First, it's a hinged arm, right? It's not just an arm with distal and proximal segments. It's an arm with a hinge. Correct. But as I read it, that refers to the proximal and distal segments and the hinge there between. Right. And there's nothing, Your Honor, in the claim that precludes the spring from being the connection between the two. I'm not sure that that's what the claim says. The claim says the springing is connected to said hinged arm, which when normally read, it's something that connects to the hinged arm structure that was just described. Your Honor, again, to go back to the two points, my elbow connects my distal and proximal portions of my arm, and there's nothing that would keep that from being the connection. There's nothing in the claim term that says where the connection needs to be. The second thing is even if we accept that as true,  and it was before the district court, or that there is a separate living spring that connects what may seem to be the hinged arm to the body of the device, there are three living hinges. And so there's a reason that this didn't become the focus until this morning. And the reason is, first, there's a legal dispute between us, and we think the claim, read in light of medical research, suggests that it can be located here. But the second is, even if that weren't true, their own testimony, their own exhibit with those green arrows, shows that those are living hinges here before the hinged arm. That's only the second hinge, is it not? There are three, Your Honor. If there is one that joins the guard to the body, if there is one that joins the distal and the proximal arms, there is actually a third one at the far end of the hinged arm, which is also a living hinge, which joins at the end of the guard. And that's what's shown in, I believe it's 14, page 3A. So I think... That's on page 10 of your brief. Yes. Where is that third arm? That third hinge? The third arm, Your Honor... 14, page 3A. There's a spremi here, there's a spremi here, and there's a spremi out here at the end of the guard. If that was the channeling arm of the third one, is that the focus of the argument? Well, it's the first two. It's the first two. Because this one, even under Judge Lind's, at least under, as I understand the argument, this spremi, which is labeled as such, would be separate by definition, because if, under figures 2 and 4... I'm not making an argument, I'm just making an observation. I think you're correct in your assessment of my observation. I think to respond to Judge Garrison, I think what I was trying to say is that first living hinge is the equivalent to items 62, 66, and 68 of figures 2 and 4, so that if those are not part of the hinged arm, which I understand, Michael, is not content, they are... The two spremi would be from the distal end  Let me ask you a question, Joe. Where is the latch? The latch, Your Honor, is at... Let me get it to the right place. Yes, in fact, Your Honor, if you go to article page 13, you'll be able to see the latch in the color photo. And the latch is key, because both at the second trial, the existence of the latch and the reasons for the existence of the latch became an important issue. And as Your Honor knows from the J.L. Weld decision by Judge Slate, the existence of the latch became an important issue. The factual dispute that was tried in the jury was this. Tyco contended that the latch was only there because there was stored energy at the time of manufacturing, and that's why the latch was there. We contended and offered evidence, evidence that's sufficient to square the verdict, that in fact the latch was there to restrain the living hinge. And now when the latch was released, it moved forward. And it moved forward for a reason. It was to address the stalling problem as to which there was no disputed trial. One of the reasons that you wanted to have some strangeness was to begin to move the guard forward. Now the latch was on... The latch is in the location that's shown on page 13. And there was... And I would suggest, this is just a question for Mr. Porcello, and I disagree. There was a great deal of evidence during the second trial concerning how the living hinge was made. There was a great deal of evidence concerning the fact that it would have stored energy. There was substantial evidence about the latch and what its purpose was. Then there was a testimony of our expert who testified as to what happened when you got past the latch. There was the testimony of their expert who testified as to what happened when she cut the latch off. Now, to be sure, our expert testified both that, the force of the finger and getting over the latch helped address the stalling problem and move things along. She did that because the VIAT soft limitation wasn't added until the last day of trial at Typo's request. But we had produced evidence, both from our expert, from their expert, from their engineer, Mr. Ferguson, that allowed the jury to fairly conclude that the latch was there for a reason. It was to restrain the living hinge and that when you got past the latch, you moved some distance down the needle. And the claim doesn't require that you go all the way down. It just requires that you move some distance down the needle. I know there was a demonstration by Dr. Boyce where she cut the latch and then there was movement exhibited. Yes. Is there any other substantial evidence in the record that shows movement other than that demonstration? Because that's not, in fairness, that's not the device as it's actually made and sold. It's a device that has been altered by cutting the latch. Your Honor, may I answer? I'm over my time to answer. May I answer the question? Your Honor, there are actually, there are four entries to that that are substantial evidence. The first thing is Dr. Garris testified with the device in his hand showing the jury that when you got to the latch and broke the latch, the device moved forward some on its own. So he sat there in front of the jury and showed them and showed them that it moved both together and some on their own. The second is, if you want to know what a latch is doing and whether it's holding something back or not, you cut the latch off and see if it moves. And that's what she did. And that, well, it's not necessary to show how it's used, but it demonstrates the purpose of the latch. It's a little bit like I have something holding my spare tire on the back of my car, and if you want to see if it's holding the spare tire on the back of the car, you cut off the restraining. And if the tire falls off, it was restraining them. That's not how you use it normally. That's how you determine its function. The third thing, Your Honor, is there was a lot of evidence which was cited in J.M. Rowell's opinion on the latch, its purpose, and the function it performed. And lastly, while we fully agree that the jury's examination of the devices was not evidence, the devices themselves were evidence. Over PTX 308 and 310, this jury, halfway through deliberation, said we would like another half-dozen of the accused devices. They were given a half-dozen of the accused devices after considering them, and those are evidence, evidence of determination by the substantial evidence. I want to just add a couple of observations again. Okay. Thank you, Your Honor. I appreciate that. The first point I want to briefly make is that, in fact, the district court did make two findings that were critical in September of 2004, and they were at A66 and A67 of the record. On A66, the court said, the monoject safety needle products do not have a separate spring that moves the guard toward the second position, and repeated that on the next page with respect to the blood collector, A67. So a district court, in denying a summary judgment motion, has the authority to find undisputed facts. This was found as an undisputed fact. If the plaintiff wants to now contest it, it's too late. They had six years to contest that. So there is your findings, Your Honor. Secondly, the once unlatched requirement by the district court was to limit them to what they argued and what their experts said during discovery. That's the only theory they said. Once unlatched, by itself, the spring moves. Now, two points on that. It was within the district court's discretion to limit them that way, but they did not present any other theory. But number two, there is no evidence in the record, Your Honor, that once you unlatch it, I'm talking about direct, visual evidence, that once you unlatch it, the guard moves. And in fact, all the evidence that's in the record either shows it goes backwards because it's not biased to go forward, or it doesn't move. Now, what about the testimony by Garris, 11589, saying that the biased aspects there, the bias to move the guard toward the tip of the cannula, that it's a product that's delivered to the use of a bias to move the guard toward the tip of the cannula. If, in fact, a latch is necessary to keep it biased, what's that written page, Your Honor? A11589. Yeah, I think the answer to that is that he's never talked about anything. He's never given an opinion about what happens after unlatching. And the only thing he said was, well, it's going to spring forward, and there's no evidence of that. So his attempt in— Now, if it was biased and it's latched, he still wouldn't identify it. When you unlatch it, wouldn't it automatically spring forward? Why would you latch it otherwise? I don't understand the combination between the bias and the latching otherwise. Well, he is not—he's here once again, and his only evidence at trial was what happened before it was unlatched. He talked about the stored energy and so forth, but his testimony at the second trial was, I can feel it while I'm unlatching. I can feel the spring help. And the court correctly threw that out. That was outside of their theory, and this doesn't take them beyond that in any case. Well, I think that's a sufficient answer. Thank you. Please be seated.